CARMELO QUINTANA,                  )
                                   )
                 Petitioner,       )          No. 08 C 05629
                                   )
        v.                         )
                                   )          Judge Edmond E. Chang
NEDRA CHANDLER, as the Warden      )
of Dixon Correctional Center,      )
                                   )
                 Respondent.       )

## OPINION

Carmelo Quintana seeks a writ of habeas corpus to vacate his Illinois state-court convictions for aggravated sexual assault and aggravated kidnaping, for which he received consecutive sentences. Quintana argues that his lawyer, Dennis Kellogg, inadequately advised him on whether to take a 4-year plea deal that the State offered before Quintana's trial. Quintana rejected the deal and ended up with a 21-year imprisonment sentence. As explained below, the advice—or, really, the lack of advice as to the sentencing consequences of going to trial—was deficient, so much so that a fairminded court could only conclude that counsel fell short of the reasonable performance demanded by the Sixth Amendment's guarantee of the right to effective assistance. But Quintana has not shown that, "but for the ineffective advice of counsel there is a reasonable probability that . . . [he] would have accepted the plea . . . ." *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012). In other words, even if Quintana had received the effective assistance of counsel, he would have rejected the plea. Quintana told his lawyer that he committed no crime—going so far as committing perjury during the

state trial in maintaining his innocence—and even sufficient advice would not have changed Quintana's mind. The petition is denied.

## I.

Quintana was convicted at a bench trial. The testimony introduced at trial is described in the Illinois Appellate Court opinion affirming Quintana's conviction. *People v. Quintana*, 772 N.E.2d 833, 837-40 (Ill. App. Ct. 2002). The trial evidence is again recounted in the opinion issued by the previously-assigned judge in this case, R. 22, and that opinion also describes the state post-conviction proceedings. In summary, on a night in January 1999, Quintana and Jorge Navarette were passengers in a van driven by Dagoberto Alvarado. Alvarado drove the van alongside a woman, the eventual victim, who was walking on the street. The victim was pulled into the middle seat of the van with Navarette. Navarette struck her and attempted to have sex with her. During the sexual assault, Quintana slapped the victim's legs and buttocks. Quintana covered the victim's mouth when she screamed. At some point, Navarette got off of the victim, and she tried to escape through the side door but was pulled back into the van. She eventually did escape, jumping out of the moving van and suffering more injuries. Among other things, the trial evidence included a description of the crimes (including Quintana's involvement) based on the victim's testimony. The trial judge also heard testimony from a witness who saw the van slow down, and then saw the distraught victim standing on the street, wearing only a shirt, mouth bleeding, face cut, and screaming that she had been raped.

The State also introduced a written statement signed by Quintana. In summary, in the statement, Quintana claimed that the victim had willingly gotten into the van, but then Navarette tried to have sex with her while she resisted and said no. Quintana admitted to covering the victim's mouth when she screamed, and further admitted that when the victim tried to escape, he grabbed her. Quintana also said, in the written statement, that he slapped her buttock while the victim was on top of Navarette.

At trial, Quintana denied putting his hand over the victim's mouth, denied slapping her, and testified that it was Alvarado,[1] not Navarette, who supposedly had consensual sex with victim. Among several other details, Quintana testified that the victim agreed to have sex with Alvarado for $20. According to Quintana, an argument broke out over payment, and the victim jumped out of the van. With regard to the written statement introduced against him, Quintana contended that the police promised to let Quintana go if he signed some papers and that the police did not translate the statement for him.

The state judge found Quintana guilty, and sentenced Quintana to 15 years' imprisonment for the aggravated sexual assault and 6 years for aggravated kidnaping, the sentences to run consecutively. Navarette was also found guilty, and was sentenced to 20 years' imprisonment for the aggravated sexual assault, plus 6 years consecutive for the aggravated kidnaping. Quintana's direct appeal was unsuccessful, and the Illinois Supreme Court denied his petition for leave to appeal in December 2002.

---

[1]This opinion uses this spelling of Alvarado, which is the version that the Illinois Appellate Court used in its opinion (most of the time).

In May 2003, Quintana filed a state post-conviction petition. As relevant here, Quintana filed an affidavit averring that the State had offered a plea deal for four years' imprisonment. According to Quintana, his defense lawyer, Kellogg, failed to tell Quintana that (1) Illinois law required that sentences for aggravated sexual assault and aggravated kidnaping must run consecutively;[2] (2) sentences for those felonies would require service of 85% of the sentences,[3] rather than 50% (the usual day-for-day good-time credit); and (3) the written statement could be introduced at trial, and the acts to which he admitted in the statement could establish guilt based on the criminal-law principle of accountability. Quintana was appointed a lawyer for the state post-conviction proceeding, and the lawyer filed a 1½-page affidavit from Kellogg.

In that January 2005 affidavit, Kellogg admitted to some of Quintana's allegations, but not all of them, and not to a perfect fit. Kellogg did admit that he did not remember a "specific" discussion with Quintana about "mandatory consecutive sentencing nor do I believe I was aware of the statutory requirement at the time of our discussions." Kellogg Aff. ¶ 4. With regard to serving 85% of the sentence, Kellogg had "some brief discussion that sentences were no longer 'day to day' (50%). I do not recall specifically using the words 85% of actual sentence in discussing the [State's] four-year offer." *Id.* ¶ 6. With regard to the statement, Kellogg stated that "during the discussion of the four-year offer, I did not advise Mr. Quintana that his signed statement would

---

[2]730 ILCS 5/5-8-4.

[3]730 ILCS 5/3-6-3(a)(2)(ii).

be admitted into evidence at trial, and that it established his guilt of both aggravated criminal sexual assault and aggravated kidnaping by accountability." *Id.* ¶ 8. On the overall decision to take or reject the plea deal, "there was a discussion of the state's offer of four years as being reasonable, it was not specifically recommended because [Quintana] insisted that he was not directly involved and the actual perpetrator was an individual who had fled to Mexico." *Id.* ¶ 7. That reference to a fugitive was a reference to Dagoberto Alvarado.

The state post-conviction court denied the petition, R. 16, Exh. Q, and that decision was affirmed by the Illinois Appellate Court, R. 16, Exh. U. The Illinois Supreme Court denied leave to appeal.

## II.

### A.

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. In order to prove the violation of that right, a defendant must show both a failure of counsel's performance and prejudice arising from that inadequacy. On performance, the question is whether "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 668 (1984). On prejudice, the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The right to effective assistance of counsel does cover representation during plea negotiations. That principle is long-established, at least as it applied to counsel's advice

to plead guilty. *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985) (citing *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). More broadly, however, counsel also must provide effective advice in advising a defendant on whether *or not* to plead guilty, and a violation of the right to counsel may arise from deficient advice even if the defendant receives a fair trial after rejecting the plea offer. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *see also Julian v. Bartley*, 495 F.3d 487, 497-98 (7th Cir. 2007). Indeed, "[h]aving to stand trial, not choosing to waive it, is the prejudice alleged." *Lafler*, 132 S. Ct. at 1385. So to prove prejudice where a defendant alleges inadequate advice in considering a plea offer,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, *that the defendant would have accepted the plea* and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id.* (emphasis added). As noted by the emphasized language, the threshold requisite showing of prejudice is "that the defendant would have accepted the plea." *Id.* If a defendant can show both deficient performance and prejudice from that deficiency, then the court must implement an appropriate remedy, in the form of a resentencing or requiring the prosecutor to reoffer the deal, depending on the circumstances. *Id.* at 1389.

In this federal habeas case, those right-to-counsel standards must themselves be viewed through the additional lens of the standards governing collateral review of state convictions and sentences. On legal issues, the writ may not issue unless the

state court's adjudication of the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). On factual issues, the writ may not issue unless the state court's adjudication of the claim was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). With the right-to-counsel and habeas standards in mind, it is time to address the performance and prejudice prongs of Quintana's ineffective assistance of counsel claim.

## B.

On performance, it was unreasonable for the state court to reject Quintana's claim that Kellogg's advice about the deal fell below the quality of representation required by the Sixth Amendment. More specifically, Kellogg's performance was unconstitutionally deficient in failing to warn Quintana that (1) the sentences on the sexual assault and the kidnaping counts *must* run consecutively and (2) good-time credits on the sentences for those felonies *must* be limited to 15% rather than half-off. It was unreasonable for the state court to conclude otherwise. Before turning to the details, it might seem strange to say that the state court actually rejected Quintana's consecutive-sentence and good-time advice arguments because the state court did not explicitly hold that Kellogg performed reasonably. Neither the state post-conviction court (that is, the Circuit Court of Cook County) nor the Illinois Appellate Court decided whether the failure to advise Quintana about the mandatory consecutive sentences and the mandatory limitation on good-time comprised objectively

7

unreasonable performance. *See* R. 16, Exhs. Q, U. The post-conviction court addressed the accountability advice (and discussed a beside-the-point consideration, namely, the strength of the evidence), Exh. Q at 24-25, while the appellate court expressly addressed only whether Quintana showed a reasonable probability of prejudice (the court might have implicitly, if not expressly, addressed the advice concerning the written statement, as discussed below), Exh. U at 4-7.

So admittedly the Court is indulging in the presumption that the state court actually did reject the performance arguments. But that is a presumption that § 2254(d) requires. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011). The failure to explicitly give reasons for the denial of a claim is not by itself a basis to conclude that the state court did not adjudicate the claim on the merits; neither the text of § 2254(d) nor sound policy requires state courts to provide reasons before enjoying the deferential standards of review in § 2254(d). *Id.* at 784 (state courts are entitled to concentrate their resources where opinions are needed most). And deference still applies if the state court discusses some reasons, but not all, for denying a claim. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011) (citing *Harrington* and stating, "The Supreme Court's ruling precludes our inferring error from the Wisconsin court's failure to discuss particular pieces of evidence.") As *Harrington* put it, the bottom-line is that

> [w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim," not a component of one, has been adjudicated.

131 S. Ct. at 784. So, even though the state court did not explicitly discuss whether Kellogg's advice (or lack thereof) on the mandatory consecutive sentences and the mandatory limitation on good-time was deficient performance, the writ still cannot issue unless there was no reasonable basis for the state court to deny relief. *Id.*; *see Price*, 637 F.3d at 839 (applying deference where state court's opinion did not address particular pieces of evidence).

But there is no reasonable basis to deem Kellogg's lack of advice on mandatory consecutive sentences and the mandatory limitation on good-time as anything other than unconstitutionally defective representation. "A reasonably competent attorney will attempt to learn all of the facts of the case, make an estimate of the likely sentence, and communicate the result of that analysis before allowing the client to plead guilty." *Julian*, 495 F.3d at 495 (citing *Bethel v. United States*, 458 F.3d 711, 717 (2006); *Moore v. Bryant*, 348 F.3d 238, 241 (7th Cir. 2003); *United States v. Barnes*, 83 F.3d 934, 939 (7th Cir. 1996)). Although a sentencing misprediction does not, on its own, equate to unreasonable performance, *Barnes*, 83 F.3d at 940, here Kellogg failed to provide crucial advice on two *mandatory* aspects of the sentences Quintana was facing. No matter what, the sentences would run consecutively, so at a minimum Quintana would receive a 12-year sentence (in light of the 6-year minima that applied to both counts). And, no matter what, Quintana would serve at least 85% (not just 50%)

of the imprisonment sentences. On the former point, it was insufficient for Kellogg to warn, as he claims he did, vaguely that the sentence would be "much more," Hearing. Tr. at 31; and on the latter point, it was insufficient for Kellogg to have a "brief" discussion about the inapplicability of day-for-day good-time credit, without actually warning Quintana what the substantially-increased limitation on credit was. Kellogg Aff. ¶ 6. The State does not argue, nor could it, that these two mandatory aspects of the sentences were difficult to predict; those mandates involved no fact-finding, no exercise of discretion by the prosecutor or the state court, and no in-depth legal research or analysis. Reasonable competence demanded that Kellogg advise Quintana about those fixed, significant sentencing consequences. No court could reasonably conclude otherwise.

Indeed, for all the record shows, the Illinois Appellate Court might have agreed that Kellogg's performance on these two points was unreasonable. In its written opinion, the appellate court described Quintana's ineffective assistance argument, citing to the two easily-findable Illinois statues that mandated consecutive sentences and limited good-time credits. Exh. U at 4. The court then set forth general post-conviction and ineffective-assistance principles. *Id.* at 5. Tellingly, the opinion's next paragraph described *People v. Curry*, 178 Ill. 2d 509, 528, 687 N.E.2d 877, 887 (Ill. 1997), citing it for the proposition that a defendant does have the right to be reasonably informed about the consequences of "accepting or rejecting a plea offer." Exh. U at 6. Next, the court stated, again citing *Curry*, "A criminal defense attorney has the obligation to inform his client about the maximum and minimum sentences that can

be imposed for the offenses with which the defendant is charged." *Id.* Kellogg failed to do that; Kellogg himself did not know that the minimum 6-year sentences had to run consecutively, so he could not have informed Quintana that 12 years was the true minimum sentence. Even at the time of sentencing, Kellogg himself was "somewhat surprised" when the consecutive sentences were imposed. Kellogg Aff. ¶ 5. So Kellogg did not do what the Illinois Appellate Court said he must,[4] and perhaps the court did believe Kellogg acted unreasonably. In any event, the point is that Kellogg's failure to warn Quintana about the mandatory consecutive sentences and the mandatory limit on good-time credits was so deficient that no reasonable court could conclude otherwise.

The advice concerning the statement and the law of accountability is a different story. On this issue, in an affidavit attached to his supplemental post-conviction petition, Quintana averred:

> I did not understand the law of guilt by accountability. My attorney did not tell me, *in discussing the four-year offer*, that the State would introduce my signed statement, and that if the court believed my statement, it would show my guilt by accountability. My attorney told me that I had a "winnable" case and did not recommend accepting the offer.

---

[4]None of this is to say that there is a rigid rule, never to be deviated from, that a criminal defense attorney must always include, in every discussion with a client about a plea, the maximum and minimum sentences that a defendant risks by going to trial. There are too many potential variation on the facts for there to be an "always" or "every"-rule in governing the conduct of a defense attorney. For example, what if a plea discussion occurred immediately after an arraignment at which the court or the prosecutor (or both) informed the defendant of the maximum and minimum sentences? It is not clear that defense attorney must repeat the warning on pain of acting unconstitutionally if he or she does not.

Quintana Aff. ¶ 8 (emphasis added). The emphasized language was paraphrased in Kellogg's affidavit on this issue: "[D]uring the discussion of the four-year offer, I did not advise Mr. Quintana that his signed statement would be admitted into evidence at trial, and that it established his guilt of both aggravated criminal sexual assault and aggravated kidnapping by accountability." Kellogg Aff. ¶ 8. This is a fuzzy set of facts on which to rely to show no "possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87. The affidavits state only that Kellogg did not mention the statement's admissibility and the law of accountability *during* the discussion of the four-year offer; the affidavits' wording is confined, perhaps carefully, to that specific time. So there is a lack of evidence—viewing the affidavits alone—as to what Kellogg did advise Quintana concerning those topics, how often Kellogg did so, and if Kellogg did, how soon before or after the plea discussion the advice was given. Nor do the affidavits offer an explanation of why Kellogg did not mention, during the plea discussion, the statement and the law of accountability (in contrast, it is easy to explain why Kellogg did not give advice about the consecutive-sentences and good-time limits; Kellogg did not know very much, if anything, about those topics). And in his trial testimony, Quintana denied any wrongdoing by not only himself, but by the others for whose conduct he could be held accountable. On this record, it is possible for a fairminded jurist to conclude that Quintana had not met his burden to show that this aspect of Kellogg's performance was unreasonable.

The "on this record" limitation is required by § 2254(d)(1), as interpreted in *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011). Remember that § 2254(d)(1)

applies to any claim adjudicated on the merits, and *Harrington* presumes that even unexplained decisions were adjudicated on the merits. In those circumstances, when evaluating whether a state-court decision was contrary to (or involved an unreasonable application of) established law under § 2254(d)(1), a federal court is limited to the record before the state court. *Cullen*, 131 S. Ct. at 1398.

Quintana's post-conviction counsel (who performed admirably) did not try to expand on the affidavits of Quintana and Kellogg. In the written filing, there was no request for an evidentiary hearing. *See* Exh. N (Part 1) at 4-9. During the oral argument before the state post-conviction court, Quintana's counsel concluded by mentioning that she had brought copies of certain cases, and then offering merely to "authenticate" the affidavits in an evidentiary hearing:

> So for those reasons—I do have Curry [the ineffective-assistance case], I do have Alden versus Kentucky [a Confrontation Clause case] with me. We would submit that he should even prevail on the pleadings or evidentiary hearing is desired to *authenticate* counsel's affidavit or of trial counsel, but we'd ask for a new trial for Mr. Quintana.

R. 16, Exh. Q at 17 (emphasis added) (July 25, 2006 hearing). Later, in a short rebuttal argument, post-conviction counsel read from the Kellogg affidavit, but did not ask for an evidentiary hearing, instead saying, "The Court should review the affidavit." R. 16, Exh. Q at 19. On the state record, as discussed above, the state court could reasonably reject Quintana's argument that Kellogg performed deficiently in advising (or not advising) Quintana about the statement and the law of accountability during the discussion of the plea.

## C.

That still leaves Quintana with two valid complaints that Kellogg performed unreasonably: he failed to warn Quintana about the mandatory consecutive sentences and the mandatory limit on good-time. But in order to prevail, Quintana must show that the unreasonable performance caused prejudice, starting with proving that he would have accepted the plea. In other words, Quintana must prove that "but for the ineffective advice of counsel there is a reasonable probability that . . . [he] would have accepted the plea . . . ." *Lafler*, 132 S. Ct. at 1385. More precisely, because § 2254(d) governs this habeas review, Quintana must show that the state court's conclusion that he suffered no prejudice was unreasonable. This is a heavy burden:

> a state court's determination that a defendant was not prejudiced by his lawyer's ineffectiveness is entitled to great weight in a federal habeas corpus proceeding, as emphasized with rather unexpected vigor by the Supreme Court when it said recently that a state prisoner can prevail in a federal habeas corpus proceeding only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents . . . . [The] prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Price*, 637 F.3d at 839 (quoting *Harrington*, 131 S. Ct. at 786-87). The difficulty in carrying the burden is also highlighted by the nature of the prejudice question: it is a hypothetical fact question to ask whether there is a reasonable probability that a defendant, if he had received adequate advice, would have accepted the plea. The more that the answer to the question turns on the drawing of inferences from facts, the more difficult it is to deem a state-court determination unreasonable, for there is deferential

review of factual findings just as there is for legal questions. 28 U.S.C. § 2254(d)(2) (writ may issue only if the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.")[5]

The State seeks to confine this review even more by limiting review to the state-court record and disregarding the testimony from the evidentiary hearing ordered by the previously-assigned judge, R. 22 at 16. The State might well be correct because § 2254(d)(2) does ask the reasonableness question "in light of the evidence presented in the State court proceeding." If review were limited the state-court record, Quintana's claim would certainly fail. He offered his affidavit, in which he swore, "If I had known that the minimum sentence was not six years of which 50% would be served but 12 years of which 85% would be served, I would have accepted the four-year offer." Quintana Aff. ¶ 6. That is at least a piece of relevant evidence,[6] but it is not much,

---

[5]The factual nature of the question is demonstrated by its treatment in *Lafler*. There, the Supreme Court did conclude that the defendant proved that he would have accepted the plea deal if he had adequate advice, and the Supreme Court cited the Sixth Circuit's analysis of the question. 132 S. Ct. at 1391 (citing 376 Fed. Appx. 563, 571-72 (6th Cir. May 11, 2010)). The Sixth Circuit decided the issue based on the facts in the record, including testimony from the defendant and defense counsel, as well as other circumstantial evidence. 376 Fed. Appx. at 571-72.

[6]The State seems to argue that Quintana's "self-serving" statement is categorically insufficient to show prejudice, and it is true that, in cases cited by the State, there are criticisms of "self-serving" statements that could be interpreted that broadly. R. 61 at 24. But tracing back the case law reveals that the actual concern expressed by the line of cases is that a defendant should be as specific as possible in describing why different advice would have produced a different result. *Key v. United States*, 806 F.3d 133, 139 (7th Cir. 1986) (cited by *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993)) (cited by *United States v. Fudge*, 325 F.3d 910, 924 (7th Cir. 2003)) (cited by *Julian v. Bartley*, 495 F.3d 487, 499 (7th Cir. 2007)) (cited by State, R. 61 at 24). There is no Rule of Evidence that deems inadmissible a statement that serves the interest of the witness; trials would be a lot shorter if there was such a rule. In

especially in light Quintana's insistence (which turned out to be a lie) that he was innocent. Quintana's affidavit also did not explain what advice, if any, led him to believe that he would receive close to the minimum even if he went to trial, *see* Quintana Aff. ¶ 7, which would be the point of comparison between what he actually faced. And there are potential inconsistencies between Quintana's affidavit and Kellogg's affidavit. Kellogg averred that he briefly discussed with Quintana that the plea offer was "reasonable," Kellogg Aff. ¶ 7, but Quintana's affidavit is silent on how Kellogg characterized the offer. On the question of good-time credit, Quintana swore that he believed, before trial, that good-time credit would be 50% and that Kellogg did not tell him otherwise until after trial. Quintana Aff. ¶ 4. But Kellogg averred that there was in fact "some brief discussion" that day-for-day was no longer available, and what was missing was specific advice as to 85% during the plea discussion. Kellogg Aff. ¶ 6. If Kellogg's version is credited, then Quintana could not count on serving only 50%, which again would change the point of comparison in deciding whether to accept the plea offer. Nor does Quintana's affidavit address whether he believed that the sentences would be concurrent, and if he so believed, why he held that belief (for example, Quintana did not aver that Kellogg affirmatively advised that the sentences would be concurrent). On top of all this, what Quintana must actually show, in order

---

the context of evaluating summary judgment motions, the Seventh Circuit has tried to inter the idea that a "self-serving" affidavit (so long as it offers admissible evidence based on personal knowledge) is somehow not entitled to consideration. *E.g.*, *Marr v. Bank of America*, 662 F.3d 963, 968 (7th Cir. 2011); *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 175 (7th Cir. 2011).

to obtain the writ, is that the Illinois Appellate Court was unreasonable in concluding that Quintana failed to prove a reasonable probability that he would have taken the deal. In light of the limited state-court record, Quintana cannot carry his burden.

But even if the Court considered the evidentiary-hearing testimony,[7] the Court would find that Quintana has not shown a reasonable probability that he would have taken the deal had he received adequate advice on the mandatory consecutive sentences and the mandatory limit on good-time credit. Indeed, even if Quintana received the advice he contends he should have received as to the written statement and as to the law of accountability, the Court finds that Quintana would not have accepted the deal. Quintana insisted to Kellogg, from the start, that Quintana did nothing wrong. Consistent with his perjured trial testimony, Quintana recounted a very specific version of the events, one in which Alvarado had consensual sex, and nobody did anything wrong. Quintana "contested" the inculpatory written statement "strongly," Hearing Tr. at 64, and denied its accuracy, *id.* at 65, 82. Specifically, Quintana told Kellogg that only one page was translated into Spanish for Quintana, and the police told him that if he signed it, he would be released. *Id.*[8] Quintana told Kellogg that "he didn't do anything." *Id.* at 65-66. Quintana pointed the finger at

---

[7]It is worth engaging in this analysis because it "has never been authoritatively determined" when an evidentiary hearing may be held in a federal habeas review. *Price*, 637 F.3d at 837.

[8]Joe Lopez, who was Navarette's counsel, at times worked jointly with Kellogg and Quintana in defending the case. Lopez testified at the evidentiary hearing, and he too remembers Quintana saying that he "was tricked into signing the statement, that is not what he told the police, and that certain things in that statement, he did not do." Hearing Tr. at 185.

Alvarado as the only one who had sex with the victim, and that it was consensual. *Id.* at 66. Quintana denied ever holding her down, restraining her, or striking her, including hitting her on the buttocks. *Id.* at 68. Kellogg's contemporaneous notes of his interviews of Quintana corroborate that Quintana recounted that version. *Id.*; Resp.'s Hearing Exhs. 3, 4.

Quintana argues that it is common sense that anyone faced with the choice between the 4-year offer and a minimum of 85% of 12 years would accept the deal. But relying on someone's notion of common sense can be a dangerous platform on which to ground judicial fact-finding. Accepting the plea deal would require admitting the commission of a serious crime, require acknowledging to his lawyer that he had lied about his innocence, and require serving two years of imprisonment. It might also require pointing the finger at Navarette.[9] Quintana's own idea of what common sense would have dictated does not carry his burden.

Moreover, Quintana's insistence that he was innocent, to the point of perjuring himself, distinguishes him from the defendant in *Lafler*. There, the defendant's defense counsel confirmed that the defendant "was open to pleading guilty." 376 Fed. Appx. at 572. As far as the record shows, Quintana did not express any such sentiment to Kellogg. To the contrary, Quintana "was so insistent that he would be found not guilty

---

[9]Another possible reason to insist on going to trial in hopes for an acquittal was the prospect of being deported after a conviction. But the State did not prove this as a motive, and the state-court record does not speak to that potential reason. In fact, Kellogg does not remember discussing deportation with Quintana. Hearing Tr. at 82. (Lopez says he did discuss, with both defendants, deportation as an automatic consequence of pleading, Tr. 158-59, 173, but again, Kellogg does not remember that.)

that he didn't want to hear a whole lot of other things." Tr. at 41. To be sure, that mindset of the client does not excuse Kellogg's deficient advice on the mandatory consecutive sentences and mandatory limit on good-time credits, but the mindset is relevant to showing that Quintana would not have changed course from proclaiming innocence to taking the plea offer.

And although Kellogg did not give sufficient advice, Quintana's reaction to what Kellogg did tell him is also relevant on whether effective advice would have made a difference. At the evidentiary hearing, Quintana conceded that Kellogg did tell Quintana that the plea offer was "reasonable," Hearing Tr. at 195, meaning that it was a "good offer," *id.* at 196. Kellogg credibly testified that Kellogg did make "the recommendation that it was a good sentence under the circumstances." Hearing Tr. at 38.[10] Kellogg told Quintana that if he went to trial and lost, he faced "much more, a greater sentence." Tr. 31, 80. But Quintana insisted he did not want to plead guilty. Tr. 39-40.

There is another reason to discount Quintana's testimony that he would have accepted the deal had he had adequate advice: Quintana was not a credible witness at the evidentiary hearing. Even before the evidentiary hearing, Quintana had one strike against his credibility: he committed perjury at the state trial, telling a set of detailed lies under oath. At the evidentiary hearing itself, Quintana also came across as a

---

[10]Kellogg's testimony on this point is consistent with his 2005 affidavit, which was phrased to state that the offer was "not specifically recommended because he [Quintana] insisted that he was not directly involved and the actual perpetrator was an individual who had fled to Mexico." Tr. 39.

witness who was willing to emphatically lie so long as it helped his cause. This happened four times, which is four times too many:

1.      At the hearing, Quintana testified that he told Kellogg, in the first attorney-client interview, that Quintana did put his hand over the victim's mouth and slapped her on the butt, and that Navarette had sex by force with the victim. Hearing Tr. at 189. In other words, Quintana testified that he had told the truth to Kellogg. But Kellogg's contemporaneous interview notes confirm the opposite. *Id.* at 55; Resp.'s Hearing Exh. 3, 4. There is no mention of force in the notes, and instead the victim was supposedly paid to have sex. Hearing Tr. at 55, 59, 60, 62. Kellogg credibly testified that Quintana continued to maintain that he "did nothing wrong and did not commit a crime," *id.* at 62, and that is consistent with Quintana's (perjured) testimony at the state trial.

2.      At the hearing, Quintana testified that Navarette's lawyer, Joe Lopez, told Quintana to say that Alvarado was the one who had sex with the victim. Hearing Tr. at 197. But Lopez flatly, and credibly, denied the allegation. *Id.* at 174. Kellogg's intake notes corroborate that Quintana reported to Kellogg that Alvarado had sex with the victim. *Id.* at 55; Resp.'s Hearing Exh. 3.

3.      At the hearing, Quintana testified that he did not even know he had been charged with aggravated kidnaping, and that Kellogg never told him about that charge. Hearing Tr. at 117, 120, 190. But Kellogg credibly testified that he did in fact inform Quintana that aggravated kidnaping was also charged. *Id.* at 51-52; *see also id.* at 158 (Lopez's corroborating testimony).

4.    At the hearing, Quintana testified that Kellogg did not pre-try Quintana's state-trial testimony (that is, practice the direct examination with him). Hearing Tr. at 194. But Kellogg credibly testified that he did pre-try Quintana. *Id.* at 76. Lopez confirmed that he observed Kellogg pre-try Quintana, *id.* at 162.[11]

These additional strikes against Quintana's credibility make it all the more difficult to believe his testimony that he would have accepted the deal. It is true that whether Quintana would have accepted the deal is not a historical fact question in the usual sense (it is indeed a hypothetical question), and so traditional measures of credibility might not fully apply to the question. But Quintana's impaired credibility renders it impossible to conclude that the Illinois Appellate Court acted unreasonably in rejecting his claim of prejudice.

---

[11]Lopez had no trouble criticizing Kellogg for other shortcomings, Tr. 176, so there is no reason to believe that Lopez would falsely or inaccurately testify that Kellogg did pre-try Quintana.

**III.**

Quintana's counsel did not provide the quality of representation required by the Sixth Amendment's guarantee of effective counsel. But Quintana has failed to show even a reasonable probability that sufficient advice would have caused Quintana to accept the State's plea offer. Quintana's petition for a writ of habeas corpus is denied.

ENTERED:

_____
Honorable Edmond E. Chang
United States District Judge

DATE: August 2, 2012